NORTHWESTERN NATIONAL INSUR-ANCE COMPANY, a Wisconsin corpo-ration, Plaintiff Below–Appellant,

v.

ESMARK, INC., a Delaware corporation, Beatrice Companies, Inc., a Delaware corporation, Playtex, Inc., a Delaware corporation, Playtex FP, Inc., a Dela-ware corporation, International Playtex, Inc., a dissolved Delaware corporation, Defendants Below–Appellees.

No. 146, 1995.

Supreme Court of Delaware.

Submitted: Nov. 14, 1995.

Decided: Feb. 14, 1996.

Stephen P. Casarino, Kenneth M. Doss of Casarino, Christman & Shalk, Wilmington (H. Wesley Sunu (argued), of Tribler & Or-pett, P.C., Chicago, Illinois, of counsel), for Appellant.

Donald E. Reid, Andrea L. Rocanelli of Morris, Nichols, Arsht & Tunnell, Wilming-ton (William J. McSherry, Jr. (argued), Stew-art Klein, of Battle Fowler LLP, New York City, of counsel), for Appellees.

Before HOLLAND, HARTNETT and BERGER, JJ.

BERGER, Justice:

This is an appeal from a decision by the Superior Court denying indemnification under a hold harmless agreement between an insurance company and its insured. Appellant, Northwestern National Insurance Company ("Northwestern"), issued primary liability insurance policies to appellee, Esmark, Inc. ("Esmark"), in connection with Esmark's multi-layered insurance program covering its subsidiary, Playtex, Inc., and related companies (collectively "Playtex"). A dispute arose between Playtex and one of the excess insurance carriers over the meaning of the deductible endorsement in Playtex's policies. In the ensuing lawsuits, Northwestern was named as a defendant because of its role as the primary liability carrier. Those lawsuits now have been resolved, and Northwestern filed this action to recover attorneys' fees and expenses incurred in the prior litigations. The Superior Court decided, as a matter of law, that the relevant contract language precluded Northwestern's claim. We disagree and remand for determination of the remaining issues presented by the cross motions for summary judgment.

I.

Esmark's insurance program was designed, among other things, to provide liability coverage for Playtex in connection with Toxic Shock Syndrome ("TSS") claims. Northwestern issued a primary liability policy, insuring Playtex, which had limits of $1 million per occurrence and $7 million aggregate. Mission National Insurance Company ("Mission") issued an umbrella policy providing $5 million of coverage above the Northwestern limits. Columbia Casualty Company ("Columbia") issued a policy for the next $10 million of coverage and other insurance companies issued additional levels of excess liability coverage.

All of the excess liability carriers assumed the risk of loss at the stipulated levels. Northwestern, by contrast, issued its primary liability policy as part of a fronting arrangement whereby Playtex effectively self-insured the first $7 million of its potential TSS losses. The fronting arrangement was effectuated through a deductible endorsement to the policy and a separate hold harmless agreement. The deductible endorsement provides that $1 million shall be deducted from any loss reported under the policy. Given the fact that the per occurrence policy limit is $1 million, the deductible endorsement negates Northwestern's obligation to pay any claims. In addition, the Hold Harmless Agreement provides:

In consideration of [Northwestern] issuing policies or other evidence of an assurance, as per the attached Schedule A, Esmark, Inc. hereby agrees that no loss will be reported under any of the scheduled policies or other evidence of insurance or any replacements or renewals thereof. If a loss should be reported, Esmark, Inc. agrees to indemnify and reimburse Northwestern for any and all losses and/or expenses paid on account of such loss except for any and all losses that may occur as a result of any negligent or willful and wanton act of commission or omission of Northwestern.

It is further agreed that Esmark, Inc. will indemnify Northwestern for any and all losses and/or expenses that may occur, under these scheduled policies or other evidence of insurance, as a result of a suit or other action brought directly against Northwestern except for any and all losses that may occur as a result of any negligent or willful and wanton act of commission or omission of Northwestern. Appellant's Appendix, A–3.

The underlying coverage dispute grew out of TSS claims for the 1984 policy year. Consistent with the fronting arrangement, Playtex did not report any losses to Northwestern, and Mission, the lead excess liability carrier, accepted the TSS claims above Playtex's $1 million deductible. In April, 1987, when it appeared that Mission's $5 million of coverage would be exhausted, Playtex gave notice of possible claims to its other excess liability carriers. Columbia, one of those carriers, took the position that the deductible endorsement in Playtex's policy with Northwestern required Playtex to pay the $1 million deductible for every claim, without aggregation.

Columbia filed suit against Playtex and others seeking a declaratory judgment supporting its interpretation of the deductible endorsement and other relief. The action was filed in Illinois state court and named Northwestern as a defendant. Playtex removed the Illinois action to the United States District Court for the Northern District of Illinois, Eastern Division, and filed a reciprocal action against Columbia and other excess liability carriers in Delaware. Again, Northwestern was named as a defendant. The Illinois action was stayed in favor of the Delaware action and the dispute over the deductible endorsement was decided by the Superior Court, after trial. *See Playtex FP, Inc. v. Columbia Casualty Co.,* Del.Super., 609 A.2d 1087 (1991).

Shortly after Northwestern was named as a defendant in the coverage litigations, it filed the present action for reimbursement of expenses and attorneys' fees. Northwestern's suit was stayed pending resolution of the coverage claims. When the stay was lifted, the parties filed cross motions for summary judgment, relying upon the factual record created in the coverage trial. The Superior Court held that the language of the Hold Harmless Agreement is not ambiguous and that the applicable paragraph provides indemnification only if the action against Northwestern arises from a risk insured under the primary liability policies. Since the coverage litigations involved a dispute over the meaning of a policy provision, not an insured risk, the Superior Court concluded that Northwestern is not entitled to indemnification.

## II.

■ A decision granting summary judgment is subject to *de novo* review. *Hudson Farms, Inc. v. McGrellis,* Del.Supr., 620 A.2d 215, 217 (1993). Where, as here, the issue on appeal is a matter of law, we must decide whether the Superior Court correctly formulated and applied legal precepts. *Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990). The principles governing contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. *E.I. duPont*

*de Nemours and Co., Inc. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1113 (1985). Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1195 (1992). Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract. *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473, 478 (1991).

Thus, the first issue we must decide is whether the Hold Harmless Agreement is ambiguous. Although the parties disagree as to the proper interpretation of the contract, their disagreement does not create an ambiguity. "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc,* 616 A.2d at 1196. Both parties argue that the Hold Harmless Agreement is clear and unambiguous. We agree. The language is clear and, when interpreted as written, it entitles Northwestern to seek indemnification on the facts presented.

■ The Hold Harmless Agreement consists of two paragraphs. The first paragraph provides, in relevant part, that, "no loss will be reported under any of the scheduled policies...." However, if a loss is reported, Esmark will indemnify Northwestern "for any and all losses and/or expenses paid on account of such loss...." The parties agree that this paragraph provides indemnification with respect to reported losses. They also agree that it is not applicable, as no loss was reported.

The second paragraph of the Hold Harmless Agreement provides, in relevant part, that Esmark will indemnify Northwestern "for any and all losses and/or expenses that may occur, under these scheduled policies ..., as a result of a suit or other action brought directly against Northwestern...." There is no question but that Northwestern incurred expenses as a result of a suit or other action brought against Northwestern.

The only issue is whether those expenses occurred "under [the] scheduled policies."

Esmark argues that the Hold Harmless Agreement only protects Northwestern from the risks insured in its primary liability policies. The first paragraph accomplishes this result by providing indemnification if a loss is reported. The second paragraph provides the same protection if a third party TSS claimant files suit against Northwestern. In short, Esmark reads "under these scheduled policies" to mean insured risks under the scheduled policies.

Relying on this analysis, Esmark argues that Northwestern is not entitled to indemnification for expenses incurred in connection with the coverage litigations. Esmark points out that Northwestern faced no risk of loss in those actions. The only issue was whether the deductible endorsement obligated Esmark to pay additional amounts before seeking recovery from the excess liability carriers, and none of the parties to the coverage litigations sought monetary damages from Northwestern. Indeed, Esmark speculates that Northwestern's only interest in the coverage litigations was its concern about how a judicial interpretation of the deductible endorsement would impact other Northwestern policies. These circumstances, according to Esmark, support its construction of the Hold Harmless Agreement and its conclusion that Northwestern is not entitled to indemnification.

We find Esmark's interpretation to be untenable, because it adds a limitation not found in the contract language. The common and ordinary meaning of the word "under," as used in the Hold Harmless Agreement, is "within the group or classification of." *American Heritage Dictionary* 1395 (1969). The phrase "under these scheduled policies" identifies the group of policies included in the indemnification obligation. The Hold Harmless Agreement contains no express limitation on the nature of the substantive claim that may be brought against Northwestern. The only requirement is that the claim be one that is within the group of policies identified in Schedule A.

Here, Northwestern was named as a defendant in two lawsuits arising out of the scheduled policies. That fact is sufficient to trigger the provisions of paragraph two of the Hold Harmless Agreement. No limitations may be read into the clear language of the contract. Thus, it matters not that Northwestern faced no risk of loss or that it may have been a nominal defendant. Northwestern was named as a defendant in its capacity as the primary liability carrier and its claim for reimbursement of attorneys' fees and expenses is covered by the Hold Harmless Agreement.

By this holding, we do not suggest that Northwestern is entitled to the entry of judgment in its favor. The Superior Court did not decide the choice of law issue raised by Esmark. If the Superior Court determines that the Hold Harmless Agreement is governed by Illinois law, rather than Delaware law, Esmark contends that Northwestern's claim for reimbursement of attorneys' fees will be eliminated. We decline to address this issue in the first instance.

Based upon the foregoing, the decision of the Superior Court is REVERSED and the action is REMANDED for further proceedings in accordance with this opinion.